UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ROBERTO VLADIMIR PORTILLO MARTINEZ, | ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) ) | Civil Action No. 25-11909-BEM |
| PATRICIA HYDE, et al., | ) ) ) | |
| Respondents. | ) ) | |

MEMORANDUM AND ORDER ON
PETITION FOR WRIT OF HABEAS CORPUS

**MURPHY, J.**

At thirteen years old, in 2016, Petitioner arrived in the United States as an unaccompanied minor from El Salvador. He has lived in this country ever since and, in 2019, was granted Special Immigrant Juvenile ("SIJ") status, making him eligible for Lawful Permanent Residency. In recognition of that fact, and in recognition of Petitioner's entitlement to an adjudication of his asylum application (still pending), an immigration judge closed Petitioner's removal proceedings in 2021, so that Petitioner could wait out the years-long backlog on his claims.

Notwithstanding, on July 3, 2025, Petitioner was detained by Immigration & Customs Enforcement ("ICE"). Despite his living in this country for more than nine years, and despite the special process he received as a minor, and despite being a "hair's breadth from being able to adjust [his] status," *see Rodriguez v. Perry*, 747 F. Supp. 3d 911, 918 (E.D. Va. 2024) (quoting *Osorio-Martinez v. Att'y Gen. United States of Am.*, 893 F.3d 153, 174 (3d Cir. 2018)), Respondents argue that they are *required* to detain Petitioner, without bond, indefinitely, because

he is somehow still an "arriving alien," subject to mandatory detention under 8 U.S.C. § 1225 ("section 1225"). Dkt. 28 at 2.

Petitioner is not an "arriving alien." He has not been "arriving" in this country for almost a decade. Respondents make no cogent argument to the contrary. Accordingly, section 1225 cannot apply. To the extent Respondents have any lawful authority to detain Petitioner, it is under 8 U.S.C. § 1226 ("section 1226"), which entitles him to a bond hearing. That is exactly what an immigration judge concluded on July 21, 2025, when that court ordered Petitioner released on bond of $10,000. The BIA has now stayed that release order, however, leading to Petitioner's re-detention.

Petitioner's case features a complex procedural history. And multiple red-herring side-issues risk distraction and detour. But, at bottom, this case presents only a minor variation on a recent-but-widespread pattern of non-citizens' being improperly detained under the mandatory detention statute, which courts across the country have overwhelmingly rejected. *See, e.g.*, *Aguiriano Romero v. Hyde*, — F. Supp. 3d —, 2025 WL 2403827, at *1 (D. Mass. Aug. 19, 2025) (collecting cases); *Diaz Martinez v. Hyde*, — F. Supp. 3d —, 2025 WL 2084238, *2–8 (D. Mass. July 24, 2025). Indeed, "[m]ore than 100 federal judges," appointed by every president since Ronald Reagan, "have now ruled at least 200 times" that the practice is illegal.[1] Having received near-universal rebuke on that starter theory for sweeping detention, it seems Respondents now

---

[1] Kyle Cheney, *More Than 100 Judges Have Ruled Against the Trump Admin's Mandatory Detention Policy*, POLITICO (Oct. 31, 2025, 4:29 PM), https://www.politico.com/news/2025/10/31/trump-administration-mandatory-detention-deportation-00632086 [https://perma.cc/4NXW-GDM8].

seek to move the goalpost in a new way, by redefining "arriving alien."[2] But words have meaning, and there is no sense in which Petitioner has been "arriving" since 2016.

Accordingly, the Court will grant this Petition and order Petitioner released, consistent with the July 21, 2025 decision of the immigration court.

I. **Background**

   A. **Pre-Detention: 2016–2025**

Petitioner is a native and citizen of El Salvador.[3] Dkt. 16-1 ¶ 6. On October 21, 2016, Petitioner presented himself to Customs and Border Patrol ("CBP") at the Hidalgo, Texas Port of Entry. *Id.* At that time, CBP determined that Petitioner was an Unaccompanied Alien Child ("UAC"); served him with a Notice to Appear in removal proceedings, alleging inadmissibility; and transferred custody of Petitioner to the Office of Refugee Resettlement ("ORR") in the Department of Health and Human Services ("HHS"). *Id.* ¶¶ 6–7.[4]

On November 29, 2016, ORR assigned custody of Petitioner to his abusive father.[5] *See id.* ¶ 8; Dkt. 23-3 ¶ 3. In 2017, Petitioner's mother took Petitioner away from his father and brought Petitioner to Massachusetts, where he has lived since. Dkt. 23-3 ¶ 3. In 2019, a Massachusetts

---

[2] The recent influx of cases has primarily concerned detention under section 1225(b)(2), rather than under section 1225(b)(1), which Respondents claim to be at issue here. *See* Dkt. 28 at 15. *But see* note 18, *infra* (observing that DHS may have previously argued that Petitioner's detention was under section 1225(b)(2)). In any event, as demonstrated below, the arguments are strikingly similar and fail in tandem. *See* notes 18, 36 and accompanying text, *infra*.

[3] Unless otherwise noted, the relevant facts are not in dispute and are drawn variously from the Second Amended Petition and its exhibits, *see generally* Dkt. 23, and from declarations submitted by Respondents' agent, *see* Dkts. 16-1, 28-1.

[4] *See* 8 U.S.C. § 1232(b)(3) ("Except in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child.").

[5] Before handing over a UAC, HHS is required to "make[] a determination that the proposed custodian is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3).

juvenile court entered findings regarding the history of abuse suffered by Petitioner, providing the basis for Petitioner to apply for SIJ status, which was approved by USCIS later that year.[6]  *See* Dkt. 16-1 ¶¶ 10, 14; Dkt. 23 ¶ 20; Dkt. 23-4.[7]  Petitioner also filed with USCIS an affirmative application for asylum and withholding of removal on June 1, 2020.[8]  Dkt. 16-1 ¶ 16.  Given these developments, on July 30, 2021, Petitioner moved the immigration court to administratively close his removal proceedings.[9]  Dkt. 16-1 ¶ 17; Dkt. 23 ¶ 24.  On August 16, 2021, Petitioner's motion was granted.  Dkt. 16-1 ¶ 19.

---

[6] Thus, as of 2019, Petitioner has been statutorily eligible for Lawful Permanent Residency.  *See* 8 U.S.C § 1255(h).  However, "[d]ue to ongoing visa number unavailability, the protection that Congress intended to afford SIJs through adjustment of status is often delayed for years."  U.S. Citizenship & Immigr. Servs., *Policy Alert PA-2022-10, Special Immigrant Juvenile Classification and Deferred Action* (Mar. 7, 2022), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220307-SIJAndDeferredAction.pdf.  Based on Petitioner's SIJ Approval Notice "Priority Date," it appears that Petitioner has only been eligible to *apply* for adjustment since 2024.  *See* Dkt. 23-4; U.S. Dep't of State, Bureau of Consular Affs., *Visa Bulletin for January 2024*, vol. X, no. 85 (Jan. 2024), https://travel.state.gov/content/dam/visas/Bulletins/visabulletin_January2024.pdf.  Of course, at that point, Petitioner's asylum claim had already been pending for nearly four years.

[7] The Court notes briefly that both sides present factually compatible (if atmospherically divergent) accounts of Petitioner's generally unremarkable juvenile record; none of which resulted in any adjudication; and none of which has any relevance to this Petition.  *See* Dkt. 16-1 ¶¶ 11–13, 15, 18; Dkt. 23 ¶ 25; Dkt. 23-3 ¶ 5; Dkt. 23-6; *see also* Dkt. 16-1 ¶¶ 20–21 (highlighting Petitioner's two driving-related charges since turning 18); Dkt. 23 ¶ 26.  To the extent Respondents believe that Petitioner's record indicates any risk to the community, warranting detention, that argument was properly made to and rejected by the immigration court.  *See* Dkt. 23-10 at 8 (noting "that the record was devoid of any evidence" to support DHS's apparent contention that Petitioner was a gang member).

[8] DHS, rather than the immigration court, has initial jurisdiction over asylum applications filed by UACs.  *See* 8 U.S.C. § 1158(b)(3)(C).  Normally, the immigration courts would have jurisdiction over an asylum application filed by a non-citizen who, like Petitioner, had already been served a Notice to Appear.  *See* 8 C.F.R. § 1208.2(b).

[9] "Administrative closure is the temporary suspension of a case.  Administrative closure removes a case from the immigration court's active calendar until the case is recalendared."  8 C.F.R. § 1003.18(c).

4

It appears that nothing, other than waiting, happened in Petitioner's immigration case between 2021 and 2025.[10]

### B.    First Detention and Release: July 2025

On July 3, 2025, an ICE officer encountered and questioned Petitioner near Petitioner's home in Lynn, Massachusetts. Dkt. 16-1 ¶ 22; Dkt. 23 ¶ 27; Dkt. 23-9 at 4. Petitioner was served a Warrant of Arrest (Form I-200) and a Notice of Custody Determination (Form I-286), which stated that his detention was "[p]ursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations," *i.e.*, section 1226 and its implementing regulation. Dkt 16-1 ¶ 23; Dkt. 23-9 at 2, 4. The Notice of Custody Determination further stated that Petitioner could "request a review of this custody determination by an immigration judge," which Petitioner duly elected by checking the box that followed. Dkt. 23-9 at 2. As to this Notice, Respondents' declarant states that, "[o]n July 18, 2025, ICE cancelled the Form I-286, Notice of Custody Determination, as it was issued in error because Petitioner is not detained under 8 U.S.C. § 1226." Dkt. 16-1 ¶ 27.

On July 21, 2025, an immigration judge held a custody redetermination hearing under section 1226 and ordered Petitioner released on a bond of $10,000. *Id.* ¶ 29. However, DHS

---

[10] Elsewhere, however, a class-action settlement agreement, applicable to Petitioner, was reached in *J.O.P. v. U.S. Dep't of Homeland Sec.*, Civ. No. 8:10-01944-SAG (D. Md. Nov. 25, 2024). This Agreement is notable because it seems to indicate that DHS cannot move forward with Petitioner's removal proceedings (or removal, if it were to somehow obtain a final order) unless and until it adjudicates Petitioner's still-pending asylum application on the merits. *See id.* §§ H, I. Although it is not necessary for the Court to reach due-process arguments to settle this Petition, *see* note 21, *infra*, the *J.O.P.* Settlement Agreement is striking evidence that Petitioner's removal is apparently neither imminent nor inevitable—indeed, it is unclear whether DHS's moving to recalendar Petitioner's removal proceedings is even consistent with the *J.O.P.* Settlement Agreement—making the reasonableness of related detention constitutionally suspect. *See Velasquez Rincon v. Hyde*, — F. Supp. 3d —, 2025 WL 3122784, at *8 n.23 (D. Mass. Nov. 7, 2025) (discussing how courts have evaluated the constitutional reasonableness of detention under section 1225(b)).

unilaterally stayed that order, preventing Petitioner from immediately posting bond.[11]  Dkt. 23 ¶ 30.  DHS then moved the immigration judge to reconsider her decision, "re-asserting their position regarding jurisdiction and arguing that [the immigration judge] lacked jurisdiction to rule on a custody redetermination because the [Notice of Custody Determination] ha[d] been cancelled and [Petitioner] is an arriving alien."[12]  *Id.* ¶ 30; Dkt. 16-1 ¶ 30; Dkt. 23-10 at 9 n.4.

On July 29, 2025, DHS rescinded its stay.  Dkt. 23 ¶ 31; Dkt. 23-11 at 4.  The next morning, Petitioner posted bond and was released.  Dkt. 16-1 ¶ 32; Dkt. 23 ¶ 32.  Later that day, however, apparently at 4:24 p.m., DHS filed an appeal with the BIA and sought an emergency stay of the release order (that had earlier been executed).[13]  Dkt. 16-1 ¶ 31; Dkt. 23-11 at 4; Dkt. 23-12.  By day's end, the BIA had granted DHS's motion.  Dkt. 16-1 ¶ 33; Dkt. 23-11 at 4; Dkt. 23-13.  In its Stay Order, the BIA stated that, "[a]fter consideration of all information, the Board has concluded that the motion for emergency stay of the bond order w[ould] be granted."  Dkt. 23-13 at 3.

For more than a month, from July 31, 2025, until September 8, 2025, Petitioner lived in a legal limbo—his release order was stayed, but ICE did not immediately re-arrest him.  *See* Dkt. 16-1 ¶ 34 (stating that ICE had not re-detained Petitioner as of August 14, 2025).  During that

---

[11] DHS claims authority to issue such stays pursuant to 8 C.F.R. § 1003.19(i)(2).  However, multiple courts have concluded that these stays are *ultra vires* because they usurp authority delegated by Congress to the Attorney General (and by the Attorney General to the immigration courts), not to DHS.  *See, e.g.*, *Maza v. Hyde*, — F. Supp. 3d —, 2025 WL 2951922, at *5 (D. Mass. Oct. 20, 2025); *Jacinto v. Trump*, — F. Supp. 3d —, 2025 WL 2402271, at *5 (D. Neb. Aug. 19, 2025); *Zavala v. Ridge*, 310 F. Supp. 2d 1071, 1079 (N.D. Cal. 2004); *see also, e.g.*, *Sampiao v. Hyde*, — F. Supp. 3d —, 2025 WL 2607924, at *12 (D. Mass. Sept. 9, 2025) (concluding that DHS's unilateral stay of bond order violated a petitioner's due-process rights, not reaching the *ultra vires* argument).

[12] As discussed below, DHS appealed the decision to the BIA before the immigration judge could rule on the motion for reconsideration.  *See* Dkt. 16-1 ¶ 30–31.  The immigration judge has indicated that she will not rule on that motion while the BIA appeal is pending.  *See* Dkt. 23-10 at 9 n.4; Dkt. 28-1 ¶ 7.

[13] The Court is admittedly a little puzzled as to what it means exactly to stay an order that has already been executed.  Petitioner's bond does not seem to have been "revoked" as one might use that word in the criminal context—*e.g.*, it did not trigger a warrant for Petitioner's arrest.  Stay may have simply left ICE free to re-detain Petitioner without needing to show a change in circumstances.  *See Matter of Sugay*, 17 I. & N. Dec. 637, 640 (BIA 1981) (holding that such a showing is otherwise required).

time, Petitioner lived in his usual residence, in Lynn, Massachusetts, where ICE had encountered and detained him earlier that month. Dkt. 16-1 ¶ 22; Dkt. 23 ¶ 35. Petitioner likewise continued working at his normal job as a boat mechanic. Dkt. 23 ¶ 35; Dkt. 23-3 ¶ 60.[14]

### C. Re-Detention: September 2025

On September 8, 2025, ICE apparently decided to re-detain Petitioner. Dkt. 28-1 ¶ 6. ICE again issued him a Warrant for Arrest of Alien (Form I-200). *Id.* Petitioner has since been detained in Plymouth, Massachusetts. *Id.* ¶ 11.

## II. Procedural History

Petitioner's action in this Court has transpired in parallel with some of the events outlined above. Petitioner first sought a writ of habeas corpus in this Court on July 4, 2025, following his initial detention. Dkt. 1. After his initial release, but before learning of the BIA's stay of his release order, Petitioner voluntarily dismissed his habeas action. Dkt. 9; Dkt. 23 ¶ 33. However, upon learning of the BIA's stay, later that same day, Petitioner sought to withdraw his dismissal, which the Court allowed. Dkts. 10–11; Dkt. 23 ¶ 34. Thereupon, Petitioner amended his petition, Dkt. 12, which Respondents opposed, Dkt. 16.

Given the evolving nature of Petitioner's custody situation—Petitioner was not, then, in detention, but he was "subject to" and reasonably anticipated imminent re-detention—the Court granted Petitioner's assented-to motion to hold the case in abeyance. Dkt. 17–18.

Following re-detention, on October 7, 2025, Petitioner again amended his petition. Dkt. 23. On October 14, 2025, Respondents again opposed. Dkt. 28. On October 21, 2025, with leave, Petitioner submitted a reply. Dkts. 29–31. In his Second Amended Petition, Petitioner asks

---

[14] *See also* Dkt. 23-10 at 6, 8 (showing that Petitioner's employment history was considered as part of his bond hearing).

the Court to find that his detention is governed by section 1226, such that the immigration judge properly found authority to grant bond, and to thereupon order his immediate release. Dkt. 23 at 18–19.

## III. Discussion

### A. Jurisdiction

As a threshold matter, the Court has jurisdiction to determine whether a person "is in custody in violation of the Constitution or laws or treaties of the United States" and to issue a writ of habeas corpus thereupon. 28 U.S.C. § 2241(c)(3).

Respondents argue that section 1226(e) strips this Court of its usual habeas jurisdiction insofar as Petitioner asks the Court to review the BIA's stay of Petitioner's release order. *See* Dkt. 28 at 13–15; *see also* 8 U.S.C. § 1226(e) ("The [immigration courts'] discretionary judgment regarding the application of [section 1226] shall not be subject to review.").[15] That argument fails because Petitioner "does not challenge the [BIA's] ultimate exercise of discretion"—*i.e.*, its consideration of whether he poses a flight risk or a danger to his community. *See Hernandez-Lara v. Lyons*, 10 F.4th 19, 33 (1st Cir. 2021). Rather, Petitioner challenges "the extent of the Government's detention authority under the 'statutory framework' as a whole"—*i.e.*, the legal basis for his continued detention.[16] Accordingly, the Court retains jurisdiction to hear Petitioner's claim.

---

[15] The statute refers to the "Attorney General's discretionary judgment," *see* 8 U.S.C. § 1226(e), which has been delegated by regulation to the immigration courts, including the BIA. *See* 8 C.F.R. § 1236.1(d)(1).

[16] Insofar as the BIA's Stay Order implicates both reviewable and non-reviewable elements of the immigration judge's decision, that presents a question of remedy, discussed in Section III(C), *infra*.

B.     **Basis for Detention**

Respondents next argue that Petitioner is subject to mandatory detention—meaning, detention without the possibility of bond—for the duration of his immigration proceedings because he is an "arriving alien" and thus subject to section 1225(b)(1).[17] Dkt. 28 at 15–19. Respondents deploy a significant amount of shorthand in claiming that section 1225(b)(1) mandates detention of any "arriving alien who is inadmissible to the United States." *See* Dkt. 28 at 15. In reality, the mechanism by which section 1225(b)(1) provides for detention is more complicated than that and clearly does not match Petitioner's history.[18]

---

[17] To be specific, the statute refers to "an alien . . . *who is arriving* in the United States." 8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added). The implementing regulations coin and define the term "arriving alien." *See* 8 C.F.R. § 1.2. That regulatory noun-phrase, "arriving alien," sounds somewhat more like a categorical term of art (better-fitting Respondents' argument), whereas the statute's present-progressive language highlights the active nature of a non-citizen's "arriving." *See Matter of M-D-C-V-*, 28 I. & N. Dec. 18, 23 (B.I.A. 2020) ("The 'use of the present progressive, like use of the present participle, denotes an ongoing process.'" (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999, 1011–12 (9th Cir. 2020))). Of course, between the two, the statute controls. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). Nevertheless, throughout, the Court will generally use the more convenient phrase ("arriving alien") and assume the regulation's definition.

[18] Generally, leaving out certain exceptions, "[i]f an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible under [certain grounds], the officer shall order the alien removed from the United States without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). However, if the individual expresses either an intention to apply for asylum or a fear of return, he is referred for an assessment of that claim. *Id.* § 1225(b)(1)(A)(ii). If an immigration officer (or an immigration judge, upon review) determines that the claim of fear is credible, the individual is "detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii). Obviously, none of that happened here, so it is patently unclear how section 1225(b)(1) could lead to Petitioner's detention.

It would make somewhat more sense for Respondents to claim that Petitioner is detained instead under section 1225(b)(2), which likewise provides for mandatory detention of certain arriving aliens but without the attendant asylum procedures. *See Gomes v. Hyde*, 2025 WL 1869299, at *2 (D. Mass. July 7, 2025) (laying out the relevant statutes). Indeed, the immigration judge's memorandum on the order of release seems to indicate that DHS originally claimed that Petitioner was detained under section 1225(b)(2), rather than section 1225(b)(1). *See* Dkt. 23-10 at 6–8 & nn. 1–3 ("[T]here is no indication that [Petitioner] is detained pursuant to [section 1226(c)], [section 1225(b)(1)], or [8 U.S.C. § 1231, applicable post-removal-order]. Instead, the question is whether he is detained pursuant to [section 1226(a)] or [section 1225(b)(2)].").

As mentioned above, section 1225(b)(2) has been the subject of significant attention and an overwhelming response from district courts across the country. *See* note 1 and accompanying text, *supra*. One wonders whether, in this litigation, Respondents have taken the position that Petitioner is detained under section 1225(b)(1)—notwithstanding its clear inapplicability—to avoid some of section 1225(b)(2)'s recent baggage. In any event, Petitioner likewise cannot be detained under section 1225(b)(2) because, as explained below, he was not an "arriving alien" at the time of his detention. *See Aguiriano Romero*, 2025 WL 2403827, at *8–13 (concluding that section 1225(b)(2) applies only to certain "arriving aliens").

But setting that aside, Respondents' argument is somewhat unbelievable since, at the time of his detention, Petitioner had been living in this country for more than nine years, since he was thirteen years old.  In what sense imaginable could he be deemed "arriving?"  The regulations define an "arriving alien" as

> an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport.

8 C.F.R. § 1.2.[19]  Petitioner certainly was not "coming or attempting to come into the United States" or "seeking transit through the United States" or "interdicted in international or United States waters" when ICE encountered him near his home in *Lynn, Massachusetts*.  The merits of this case are truly just that simple—Petitioner was not an "arriving alien" at the time of his detention.  Therefore, section 1225(b)(1) does not apply.[20]

To understand how Respondents wrongly reach a contrary position, one must understand how it is technically possible for a non-citizen, under the statutes, to remain subject to detention under section 1225, notwithstanding full physical presence in the United States.  Before that, however, it is important to be very clear that these facts *did not happen* and *do not apply* here.

To begin, an arriving alien, subject to detention under section 1225, may be "paroled into the United States" by DHS under 8 U.S.C. § 1182(d)(5)(A) ("section 1182(d)(5)(A)").  *See*

---

[19] An "applicant for admission" is a term of art defined by statute as, "[a]n alien present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1).  Since Petitioner is clearly not an "arriving alien," the Court need not consider whether he is even still an "applicant for admission," given his immigration case's developed history.

[20] To avoid confusion, section 1225(b)(1) may, on its own terms, apply beyond "arriving aliens," given circumstances not present or discussed here.  *See* 8 U.S.C. § 1225(b)(1)(A).  The Court notes, however, that the constitutionality of that broader application of expedited removal (and related detention) is the subject of ongoing litigation and, at present, a stay of agency action.  *See generally Make the Rd. New York v. Noem*, — F. Supp. 3d —, 2025 WL 2494908 (D.D.C. Aug. 29, 2025).

*Velasquez Rincon v. Hyde*, — F. Supp. 3d —, 2025 WL 3122784, at *3–4 (D. Mass. Nov. 7, 2025).[21] This grant of parole by DHS allows the individual to enter the country and may lead to that person's physical presence in the United States, even for an extended period. *See id.* However, if DHS revokes that parole, the individual must "forthwith return or be returned to the custody from which he was paroled," *i.e.*, must return to section 1225 custody. *See id.* (emphasis removed) (quoting section 1182(d)(5)(A)). Thus, it is technically possible for an individual to remain, as a matter of statute, an "arriving alien," subject to section 1225 custody, notwithstanding literal presence in the United States. *See also* 8 C.F.R. § 1.2 ("An arriving alien remains an arriving alien even if paroled pursuant to [section 1182(d)(5)], and even after any such parole is terminated or revoked.").[22]

But, again, DHS ***did not*** parole Petitioner into the United States. Rather, as mandated by statute, DHS transferred custody of Petitioner to HHS.[23] HHS, in turn, released Petitioner to his father in California.[24] Accordingly, the narrow parole exception to the otherwise plain meaning

---

[21] In *Velasquez Rincon*, this Court joined district courts across the country in concluding that, in some circumstances, detention without a bond hearing under section 1225 violates the Due Process Clause. *See* 2025 WL 3122784, at *1–2, 8–10 & nn. 23–24. *Velasquez Rincon* concerned an individual who, like Petitioner, had lived freely and lawfully in the United States for years prior to detention. *Id.* at *2–3. Unlike Petitioner, however, the *Velasquez Rincon* petitioner had been paroled into the United States upon arrival. *Id.* at *2. Thus, his resumed detention upon revocation of that parole comported with the detention statutes, *id.* at *3–4, if not with the Constitution.

Because, here, Petitioner's detention does *not* comport with the detention statutes, the Court need not resort to the Fifth Amendment. Nonetheless, it is obvious that Petitioner's detention is likewise unlawful on that basis.

[22] Respondents elide this direct reference to section 1182(d)(5)(A) in their quotation of that part of the regulation, perhaps because it is such an indefensible argument that DHS ever granted Petitioner that form of parole. *See* Dkt. 28 at 6 (". . . even if paroled [], and even after . . ." (brackets in original)).

[23] Dkt. 16-1 ¶¶ 6–7; *see also* 8 U.S.C. § 1232(b)(3) ("Except in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child.").

[24] Dkt. 16-1 ¶ 8; Dkt. 23-3 ¶ 3.

definition of "arriving alien" does not apply, and it remains obvious that Petitioner has not been an "arriving alien" for almost a decade.[25]

In all fairness, Respondents never *exactly* say otherwise, but it is the only way to make sense of their argument.[26] Moreover, it is the express logic behind the unfortunately misguided opinion upon which they overwhelmingly rely. In *Mendez Ramirez v. Decker*, 612 F. Supp. 3d 200 (S.D.N.Y. 2020) (cited Dkt. 28 at 2, 8–9, 15, 16, 17, 18, 24), the court concluded that a former UAC was "still properly classified as an arriving alien, even though," like Petitioner, "he was released [by HHS] to live with his [parent]." *Id.* at 219. As the *Mendez Ramirez* court reasoned,

> Although Mr. Mendez Ramirez was released from ORR custody, he is considered to be "at the threshold of initial entry" for immigration purposes pursuant to the so-called "entry fiction" by which "aliens who have been denied admission to the United States yet are present within its borders are 'treated, for constitutional purposes, as if stopped at the border.'"

*Id.* (quoting *Traore v. Ahrendt*, 2018 WL 2041710, at *1 n.2 (S.D.N.Y. Apr. 30, 2018)).

Respectfully, the *Mendez Ramirez* court got it wrong. Immediately telling, the court cited four cases dealing specifically with *parole into the United States* under section 1182(d)(5)(A), without any explanation for why that statute (and thus, those cases) were at all relevant.[27] *See id.* They are not. The court then went on to discuss *Shaughnessy v. United States ex rel. Mezei*, 345

---

[25] Again, the Court notes that it uses the phrase "arriving alien" (and its regulatory definition) as shorthand for the plainer and more active, "alien . . . who is arriving," as it appears in the statute. *See* 8 U.S.C. § 1225(b)(1)(A)(i).

[26] Respondents do cite directly to section 1182(d)(5) in their explication of the statutes, Dkt. 28 at 6, and refer specifically to this type of parole in their invocation of the entry fiction doctrine, *see id.* at 22–24. As discussed in this section, this is the same mistake made by the court in *Mendez Ramirez*, upon which Respondents heavily rely.

[27] *See Traore*, 2018 WL 2041710, at *1 ("Traore was paroled into the United States after returning from an unknown destination abroad."); *U. S. ex rel. Kordic v. Esperdy*, 386 F.2d 232, 234–35 (2d Cir. 1967) ("[U]nder 8 U.S.C. § 1182(d)(5), the Attorney General may 'parole' any alien."); *Clerveaux v. Searls*, 397 F. Supp. 3d 299, 310–11 (W.D.N.Y. 2019) ("[T]he fact that Clerveaux was temporarily paroled into the United States does not mean that, under the Immigration and Nationality Act, he was 'admitted.' 8 U.S.C. § 1182(d)(5)(A)."); *Guzman v. Tippy*, 130 F.3d 64, 65–66 (2d Cir. 1997) ("Upon entry into the United States, Guzman was paroled to a sponsor.") (citing and quoting section 1182(d)(5)(A)).

U.S. 206 (1953).[28]  *Id.* at 219–20.  But *Mezei* was (in relevant part) about Congress's power to permit "temporary harborage" at Ellis Island without "bestow[ing] . . . additional rights" on ships' passengers.  *Mezei*, 345 U.S. at 215.  Again, the court offered no explanation for how Congress's *power* to deploy so-called "entry fictions" meant that it had actually done so in the completely unrelated case of UACs.[29]  *See Mendez Ramirez*, 612 F. Supp. 3d at 219–20.

Nothing in *Mendez Ramirez* or any of the cases it cites explains why a UAC's entry into the United States—facilitated by DHS and HHS, no less—would not necessarily mean that the UAC has finished "arriving in the United States" for purposes of section 1225(b)(1).  At least as a constitutional matter, it is simply not the case that an entry into the United States occurs only when Congress intends it.[30]  *See, e.g.*, *Mezei*, 345 U.S. at 212 (affirming that "aliens who have once passed through our gates, even illegally" must be given due process of law).  Likewise, no principle of statutory construction requires, or even suggests, reading that idea into the phrase "an alien . . .

---

[28] The court also cited *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), but only for its reference to *Mezei*.  *See Mendez Ramirez*, 612 F. Supp. 3d at 219 (quoting *Zadvydas*, 533 U.S. at 693).

[29] The court further failed to recognize the difference between "entry" and "admission."  "Admission" is a term of art referring to "lawful entry."  *See* 8 U.S.C. § 1101(a)(13)(A).  By contrast, plain "entry" can be either lawful or unlawful.  The latter is generally what matters for purposes of detention under section 1225 (and for the Constitution).  *See, e.g.*, *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) ("[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality.  In the latter instance the Court has recognized additional rights and privileges not extended to those in the former.").

[30] It is, moreover, not at all obvious that Congress did *not* intend this exact outcome.  Explicitly, UACs cannot be subject to expedited removal and instead must be placed in full removal proceedings.  8 U.S.C. § 1232(a)(5)(D)(i).  That is, if anything, consistent with an expectation that UACs will receive due-process protections.

13

who is arriving."[31] *See* 8 U.S.C. § 1225(b)(1)(A)(i). To the contrary, assuming the regulatory definition (which includes an exception not apparent from the statute's plain text), the fact that aliens "paroled pursuant to [section 1182(d)(5)(A)]," *see* 8 C.F.R. § 1.2, are "specific[ally] except[ed]" from the general rule would tend to "prove" that the phrase's ordinary meaning otherwise controls, *see Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010).

With *Mendez Ramirez* go the rest of Respondents' arguments. Respondents point out that ORR's release of Petitioner to his father in 2016 was not governed by section 1226. Dkt. 28 at 16–17. That is a non sequitur.[32] Respondents work hard to argue that Petitioner is no longer entitled to special protections afforded to UACs, *id.* at 17–19, and that his SIJ status is irrelevant,

---

[31] To drive the point home, even entry that results from administrative *mistake*—*i.e.*, executive action not authorized by law—is nonetheless an entry, with statutory consequences for DHS's detention authority. *See, e.g.*, *De Andrade v. Moniz*, — F. Supp. 3d —, 2025 WL 2841844, at *5 (D. Mass. Oct. 7, 2025) ("By releasing petitioner under [section 1226], the government failed to reserve its right[s] . . . [under section 1182(d)(5)(A)] . . . extinguish[ing] the legal fiction that a non-citizen who is physically present in the United States has, in fact, not effected an entry into the United States. And once having entered, petitioner can no longer be treated as an 'applicant for admission' subject to expedited removal and mandatory detention under § 1225."); *Gomes v. Hyde*, 2025 WL 1869299, at *5–8 (D. Mass. July 7, 2025) (stating that it was "undisputed" that the petitioner could have been subject to mandatory detention under section 1225(b)(2) when first apprehended but that his subsequent release, not under section 1182(d)(5)(A), meant that his re-detention a year later was governed by section 1226).

[32] The point is that he entered through a statutory mechanism that did not establish any sort of legal fiction for his entrance. *See* notes 23–25 and accompanying text, *supra*.

*id.* at 19–22. But those are superfluous.[33] The simple fact is that Petitioner was already present in the United States at the time of his detention—not "arriving." Thus, section 1225 cannot apply.[34]

As a final point, it is worth recognizing the relationship between the argument Respondents are making here and the arguments being made (without success) in other comparable immigrant detention cases. *See Sarmiento v. Perry*, 2025 WL 3091140, at *2–3 (E.D. Va. Nov. 5, 2025) (likewise making the connection where the Government claimed that an SIJ-status-holder was detained under section 1225(b)(1)). As to section 1225(b)(2), Respondents have previously argued that mandatory detention applies to a broad category of non-citizens beyond "arriving aliens," essentially anyone who has ever entered the country without inspection. *See Aguiriano Romero*, 2025 WL 2403827, at *9. Now, as to section 1225(b)(1), Respondents accept that the provision applies only to "arriving aliens"—they must, since the statutory language is even clearer[35]—but they attempt to define "arriving alien" in such a way, as a continuing status, that it accomplishes

---

[33] Nonetheless, it is worth pointing out that Petitioner's argument that his SIJ status is incompatible with mandatory detention under section 1225 is quite strong. "For purposes of SIJ status, the [Immigration and Nationality Act] defines a 'special immigrant' as 'an immigrant who is present in the United States.'" *Rodriguez*, 747 F. Supp. 3d at 916 (quoting 8 U.S.C. § 1101(a)(27)(j)). Thus, Petitioner's SIJ status appears to be incompatible, whether by direct operation of statute or simply as indicative of presence, with finding that he was an "arriving alien," as would be required to sustain mandatory detention under section 1225. *But see Benito Vasquez v. Moniz*, 788 F. Supp. 3d 177, 181 (D. Mass. 2025) (concluding otherwise). The Court notes that it has not reached Petitioner's several other arguments regarding his former UAC status.

[34] To close the loop, section 1226 *can* apply, notably because ICE issued warrants both times it arrested Petitioner, including after DHS purported to "cancel[]" Petitioner's original Notice of Custody Determination, *i.e.*, *after* it had already supposedly concluded that Petitioner could be detained under section 1225(b). *See* Dkt. 16-1 ¶¶ 23, 27; Dkt. 28-1 ¶ 6. This is remarkable because the issuance of those warrants is consistent with detention under section 1226 but inconsistent with detention under section 1225, which does not require a warrant. *See* 8 U.S.C. § 1226(a) (requiring that arrests be made "[o]n a warrant issued by the Attorney General"); *see also Aguiriano Romero*, 2025 WL 2403827, at *8–11; *Sample Warrant for Arrest of Alien, Form I-200 (Rev. 09/16)*, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, https://www.ice.gov/sites/default/files/documents/Document/2017/I-200_SAMPLE.PDF [https://perma.cc/T6KQ-HXFE] (referring to immigration officers' authority under "section[] 236 . . . of the Immigration and Nationality Act," *i.e.*, under section 1226). ICE's repeated issuance of a warrant for Petitioner's arrest, as recently as September 2025, is evidence, at least, of ICE's difficulty in keeping its story straight as to its basis for detaining Petitioner. *See Aguiriano Romero*, 2025 WL 2403827, at *9 & n.26 (noting that recent and dramatic policy changes may account for record inconsistencies in ICE's positions on detention).

[35] *See* 8 U.S.C. § 1225(b)(1)(A)(i) (referring to "an alien . . . who is arriving in the United States").

the same broad scope.[36]  Respondents' argument as to section 1225(b)(1) is thus little more than a repackaging of its already rejected reading of section 1225(b)(2).

In sum, the Court concludes that Petitioner was not an "arriving alien" at the time of his detention.  Thus, his detention is governed not by section 1225(b)(1) but rather by section 1226.[37]

### C.    **Remedy**

Because Petitioner is detained under section 1226, he is entitled to a bond hearing wherein the Government bears the burden of showing his detention's necessity.  *Hernandez-Lara v. Lyons*, 10 F.4th 19, 41 (1st Cir. 2021).  Petitioner has already received such a hearing, but he lacks the benefit of it because the BIA stayed the immigration judge's release order.[38]

The Court finds that the BIA did so based on legal error, rather than on disagreement with the immigration judge's exercise of discretion.[39]  Although the BIA provided no reasoning for its stay decision, *see* Dkt. 23-13, several facts make that nonetheless clear.  First, the timing of the decision does not reflect detailed consideration either of the exhibits or of the immigration judge's factual findings, as would be necessary to develop any meaningful opinion on Petitioner's flight risk or danger to the community.[40]  Petitioner calls this quick turnaround a "rubber-stamping" of DHS's motion, Dkt. 31 at 2–3, but a more generous reading of the facts is simply that the BIA

---

[36] *Compare Aguiriano Romero*, 2025 WL 2403827, at *10 ("Respondents have[] [argued] that all 'applicants for admission' are necessarily (and continuously) 'seeking admission,' so long as they continue to exist in the United States." (parentheses in original)), *with* Dkt. 28 at 2 ("[A] UAC who is an arriving alien such as Petitioner 'is still properly classified as an arriving alien, even though he was released.'" (quoting *Mendez Ramirez*, 612 F. Supp. at 219)).

[37] Specifically, Petitioner's detention is governed by section 1226(a), the "default" provision for non-citizens who are "already in the country."  *See Jennings v. Rodriguez*, 583 U.S. 281, 288–89 (2018); *see also* Dkt. 23-10 at 7–8 (noting that "there [was] no indication that [Petitioner] is detained pursuant to" section 1226(c)").

[38] Dkt. 16-1 ¶ 33; Dkt. 23-13.

[39] Thus, section 1226(e) presents no issue.  *See* Section III(A), *supra*.

[40] As Petitioner documents, DHS filed its appeal at 4:24 p.m. on July 30, 2025, and the BIA issued its decision by the end of that same day.  *See* Dkt. 16-1 ¶¶ 31, 33; Dkt. 23-11 at 4; Dkt. 23-12; Dkt. 23-13.

16

recognized a pure legal issue on which it was able to act swiftly (albeit to the disagreement of this Court). Second, the main thrust of Respondents' objection to the immigration judge's release order, as noted by the immigration judge, was the jurisdictional issue, *i.e.*, whether the basis for Petitioner's detention provided the immigration judge authority to hear his bond request.[41] It follows as logical that the BIA would have focused on that issue, which could be disposed of quickly.[42]

## IV. Conclusion

The Court thus concludes that the BIA's July 30, 2025 Stay Order was improper. Accordingly, this Petition is GRANTED, and Petitioner is hereby ordered released.[43]

**So Ordered.**

Dated: November 12, 2025

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court

---

[41] *See* Dkt. 23-10 at 9 n.4 ("The Court notes that after the bond order was issued, that DHS filed a motion to reconsider on July 22, 2025, re-asserting their position regarding jurisdiction and arguing that the Court lacked jurisdiction to rule on a custody redetermination because the Form I-286 has been cancelled and Respondent is an arriving alien.").

[42] Any argument that Respondents seriously contend the merits of the immigration judge's ruling as to flight risk or danger is further belied by the fact that ICE waited more than a month to re-detain Petitioner after the BIA issued its emergency stay of his release order, *see* Dkt. 16-1 ¶¶ 33–34; Dkt. 28-1 ¶ 6, despite appearing to know his whereabouts, *see* Dkt. 16-1 ¶ 22; Dkt. 23 ¶ 35; Dkt. 23-3 ¶¶ 2–3; Dkt. 23-9 at 4.

[43] In his Prayer for Relief, Petitioner specifically requests that he be released "with his employment reauthorization document." Dkt. 23 at 18. Neither side specifically addresses this request in their briefing. To the extent that this result would be consistent with the immigration judge's release order, the Court assumes that it will follow. To the extent Petitioner requires any additional relief, he may so move.